IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| EAGLE POINT EDUCATION ASSOCIATION/SOBC/OEA; DAVE CARRELL; and STACI BOYER,<br><br>Plaintiffs,<br><br>v.<br><br>JACKSON COUNTY SCHOOL DISTRICT No. 9,<br><br>Defendant. | Case No. 1:12-cv-00846-CL<br><br>REPORT & RECOMMENDATION |

CLARKE, Magistrate Judge.

This matter comes before the Court on cross motions for summary judgment. For the reasons stated below, the Court recommends that the Plaintiffs' motion (#56) be GRANTED and defendant's motion (#63) be DENIED.

Page 1 – REPORT AND RECOMMENDATION

## BACKGROUND

Plaintiff Eagle Point Education Association/SOBC/OEA ("Association") is a labor organization with the power to bargain on behalf of approximately 340 of the School District's employees. These employees include both licensed educators and non-administrative staff members. Plaintiff Dave Carrell was vice president and acting president of the Association during the 2011-2012 school year. He was also employed by the School District until September of 2012. Plaintiff Staci Boyer was a student at Eagle Point High School during the 2011-2012 school year.

The defendant, Jackson County School District Number 9 ("School District"), is a public entity located within Jackson County, Oregon, which is governed by an elected school board. The Association and the School District were party to a labor contract, which expired on June 30, 2011. During the remainder of 2011, and until May of 2012, the Association's members worked for the School District without a labor contract, while they exhausted the dispute resolution requirements contained in Oregon's Public Employee Collective Bargaining Act, ORS 243.650 *et seq*. Once the dispute resolution requirements were exhausted, members of the Association notified the School District that they would strike beginning May 8, 2012.

On May 2, 2012, the School District's board adopted two resolutions, in anticipation of the Association going on strike. The "Resolution on Picketing" contained the following orders:

a) Picketing activities are limited to public areas.
b) No picketing will be allowed on any district property or facilities owned or leased by the District.
c) Picketers are prohibited from entering school facilities for any reason whatsoever.
d) Playground and school yard areas are off limits to picketers.
e) Picketers will not block or otherwise occupy any driveway or parking lot area adjacent to any school site.

> f) The District will instruct legal counsel to initiate complaint proceedings against any picketer who violates provisions of this resolution.

The "Resolution on Signs and Banners" adopted the following policy:

> 1) This policy shall apply to any and all other facilities owned or leased by the District.
> 2) Signs and banners will not be allowed in or upon buildings and other facilities unless written approval of the Superintendent is obtained in advance.

At the same time, the District entered in to a 3-month lease, effective May 1, 2012, for an unused vacant lot across the street from the school district headquarters. Kaplan Decl. Ex. 7. The Association had used the same lot for organizing in the past. Rosenzweig Aff. ¶ 4. The District Leadership Team Meeting Minutes on April 30, 2012 state: "The district has rented the vacant lot across from the district office and notified the union that they can't organize there." Kaplan Decl. Ex. 8.

In addition to the resolutions, the School District sent out a "Check-Out Notification Letter" to Association members dated May 7, 2012. The letter outlined a checklist of things for the staff to do before leaving school that day and informed them that they would "not be permitted on school property during the strike." Kaplan Decl. Ex. 6 (#58-1). That same day, the School District required that members of the Association sign a statement agreeing not to enter school property for any reason during the strike. The School District informed staff that "A parent who is a striking teacher shall not visit his/her child on any day in which they are participating on the picket line." Kaplan Decl. Ex. 9 at 4; see also Kaplan Decl. Ex. 13 at 14-15 (Rickert Dep. 23:17-24:2).

In response, the Association sent the School District letters dated May 5 and May 8, 2012 advising the School District that the Association believed the School District's policies

unconstitutionally infringed on Association members' right to free speech under the Oregon and U.S. Constitutions.

The Association went on strike on May 8, 2012. School District security personnel insisted that Association members, who were picketing on a public roadway adjacent to Shady Grove Elementary School, stay off the gravel on the side of road, claiming it was School District property. The same day, security personnel prevented Plaintiff Staci Boyer from driving onto school property with a sign on her back windshield that stated, "I Support D9 Teachers." Kaplan Decl. Ex. 18 at 3, 7 (Boyer Dep. 6:1-5, 11:15-24). Around that time, or shortly after, a student named Karli Gabica posted a picture of her pet on Facebook with a sign that said "Strike Dog." On May 10, then-principal of the high school, Allen Barber, sent an email to an assistant principal, Tim Rupp, identifying the names of four students, including Karli Gabica. The email stated:

> We need to contact some students tomorrow, and inform them that they are not coming to school on Monday. These are the students that have posted negativity on Facebook. . . . there will be more names on this list tomorrow.

Kaplan Decl. Ex. 11.

In response to the School District's resolutions and actions, Plaintiffs filed their original complaint (#1) against the School District on May 14, 2012, while the Association's strike was ongoing. The Association and School District reached a tentative agreement regarding a new contract on May 15, 2012, and the Association's members returned to work on May 17, 2012. The resolutions were rescinded on June 13, 2012, but the School District continues to claim the resolutions and actions taken during the strike were lawful.

## STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. Id. at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. Devereaux, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. The First Amendment is applicable to the states through the Fourteenth Amendment. Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th Cir. 2009). "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It

can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). "In order for . . . school officials to justify prohibition of a particular expression of opinion it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Id. at 509. While the government may place reasonable time, place, and manner restrictions upon speech, it may never use those restrictions as a pretext for silencing a particular viewpoint. See, e.g., Edwards v. City of Coeur d'Alene, 262 F.3d 856, 862 (9th Cir. 2001).

## I. Summary

The School District has one of the most important missions of society in educating and protecting students. The Court has no doubt that the School District is comprised of caring people who take this mission seriously. But this mission must be balanced against the constitutional rights of expression of teachers, who are equally committed to educating and protecting students, as well as the free speech rights of the students themselves. The Court is confident that with good faith negotiation and collaboration between the School District and the teachers, all of these important objectives could have been met. Instead, the School District, on the eve of the strike, unilaterally imposed broad, sweeping resolutions as a clear prior restraint on a particular viewpoint, without any showing that the restrictions were necessary to protect the mission of the School District and without any thoughtful analysis as to reasonable time, place, and manner restrictions. For the reasons set forth below, the Court finds that the actions of the School District violated the rights of the Plaintiffs under both the United States Constitution and the Constitution of the State of Oregon.

## II. The Sign Resolution is facially invalid as an unconstitutional prior restraint on student speech, and it was unconstitutional as applied to Plaintiff Boyer.

"A regulation of expression aimed at suppressing speech before it is uttered, as opposed to punishment of individuals after the expression has occurred, is a prior restraint, which generally comes before a court bearing a "heavy presumption" of unconstitutionality." Burch v. Barker, 861 F.2d 1149, 1154 (9th Cir. 1988) (citing Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)). The Ninth Circuit places student speech into three distinct categories: (1) vulgar, lewd, obscene, and plainly offensive speech, (2) school-sponsored speech, and (3) speech that falls into neither of these categories. Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 529 (9th Cir. 1992). The Sign Resolution does not purport to regulate speech in the first or second categories; therefore the speech in this case falls into the third category.

To suppress speech in the third category, "school officials must justify their decision by showing 'facts which might reasonably have led school officials to forecast substantial disruption of or material interference with school activities.'" Id. quoting Tinker, 393 U.S. at 514. In particular, "[t]he student distribution of non-school-sponsored material . . . cannot be subjected to regulation on the basis of undifferentiated fears of possible disturbances or embarrassment to school officials." Burch v. Barker, 861 F.2d 1149, 1159 (9th Cir. 1988). "A policy which subjects all non-school-sponsored communications to predistribution review for content censorship violates the first amendment." Id. at 1157.

The Ninth Circuit recently reaffirmed this rule in Diarano v. Morgan Hill Unified School District, 767 F.3d 764 (9th Cir. 2014). In that case, school administrators disallowed students from wearing clothing bearing the American flag on a Cinco de Mayo holiday, based on a history of racial tensions – including an altercation on Cinco de Mayo the previous year, and increasing evidence of potential violence. While it's true that some students' speech was restricted – they were made to choose between turning their shirts inside out, and going home for the day with an excused absence – the Court distinguished Tinker by pointing out that the officials "did not enforce a blanket ban on American flag

apparel, but instead allowed two [other] students to return to class when it became clear that their shirts were unlikely to make them targets of violence." Id. at 777. Additionally, "whereas the conduct in Tinker expressly did not concern aggressive, disruptive action, or even group demonstrations," in Diarano, school officials "could have understood the students' actions as falling into any of those three categories, particularly in the context of" the altercation the previous year. Thus, the school's conduct, even though it restricted non-vulgar, non-school sponsored speech, was constitutional because school officials reasonably forecasted substantial disruption and potential risks to student safety and they made decisions tailored to the circumstances without imposing a blanket ban.

In this case, the School District's Sign Resolution provided that "Signs and banners will not be allowed in or upon buildings and other facilities unless written approval of the Superintendent is obtained in advance." This was a blanket policy of unlimited scope and duration. Additionally, the resolution was passed specifically because the School District anticipated a strike, and it was rescinded once the strike was over. See Deposition of Cynda Rickert, 12:15, ("[T]he purpose of the resolution – the reason we passed resolutions on these particular dates. . . is that we believed that we were going to have an employee strike."). Unlike Diarano, the School District has not shown that any school officials anticipated that student-created signs or banners would cause substantial disruption of or material interference with school activities. Instead, the resolution was enacted was based on the undifferentiated fears of student expressions of support for the pending strike. Essentially, this is just the sort of policy the Ninth Circuit has held to violate students' First Amendment rights because it subjected all non-school-sponsored signs and banners to pre-distribution review for content censorship.

Even if the Sign Resolution were facially valid, it was unconstitutional as applied to Plaintiff Staci Boyer. Boyer's expression of support for the striking teachers was written on her car's rear windshield: "I Support D9 Teachers." A security guard turned her away from the

school parking lot and a school administrator told her that signs supporting teachers or "protesting" were not allowed. Boyer's sign was not lewd, vulgar, obscene, or plainly offensive. It could not possibly be construed as "school sponsored." The School District has not shown that allowing Boyer to park on the school's lot with the sign on her car would cause any disruption of or material interference with school activities.

### III. The Sign Resolution is an unconstitutional prior restraint on School District employees.

The Supreme Court has recognized that the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465 (1995) ("NETU"). However, public employees, in working for the government, have not relinquished "the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 568 (1968). "To be protected, the speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to '"the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."' Waters v. Churchill, 511 U.S. 661, 668 (1994) (quoting Pickering, 391 U.S. at 568).

Courts usually apply the balancing test from Pickering and its progeny in cases that involve a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities. NETU, 513 U.S. at 467. In NETU, however, the Court considered a case in which the government implemented a law disallowing federal employees from accepting an honorarium for making an appearance or speech or writing an article. Because the law constituted "a wholesale deterrent to a broad category of expression by a massive number of

Page 9 – REPORT AND RECOMMENDATION

potential speakers," the Court determined that the government's burden should be even greater than it was in Pickering. Id. The Court explained that a ban on expression before it occurs is a prior restraint, which "gives rise to far more serious concerns than could any single supervisory decision." Id. at 468. In defending a prior restraint, the burden is on the government to show that the expressive interests of all employees who could be affected, present and future, are outweighed by the "necessary impact on the actual operation" of the government that will result from such expression. Id. The government must demonstrate the harmful impact on actual operations "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Id. at 476.

In this case, as in NETU, the Sign Resolution constituted a wholesale deterrent to a broad category by a large number of potential speakers. It applied to all teachers and staff, striking and non-striking, and it did not distinguish between private matters and matters of public concern. There were no standards provided to indicate what content would be allowed or why. The resolution merely provided that all signs and banners had to be pre-approved. The School District has not carried its burden to show how signs and banners would have a harmful impact on actual operation of the schools, nor how the blanket ban would alleviate such harms. The resolution was therefore an unconstitutional prior restraint on speech.

### IV. The Picketing Resolution and Check-Out Notification Letter are invalid as unconstitutional restrictions on speech.

The School District asserts that, for purposes of the restricting access to school property during the strike, striking teachers and Association members cannot be considered teachers or district employees, but instead are simply "members of the general public." The Court is not fully persuaded by this assertion. However, because the Court determines that the School

District's policies and actions were unconstitutional under even the most lenient standard, the Court will accept the School District's assertion for purposes of this analysis.

"Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Defense & Educational Fund, 473 U.S. 788, 799–800 (1985). The first step in assessing a First Amendment claim relating to private speech on government property is to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Arizona Life Coal. Inc. v. Stanton, 515 F.3d 956, 968 (9th Cir. 2008) (citing Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 965 (9th Cir.2002) abrogation on other grounds recognized by Dex Media West, Inc. v. Seattle, 2011 WL 1771036, at *11 n. 8 (W.D.Wash. May 8, 2011)).

"Forum analysis has traditionally divided government property into three categories: public fora, designated public fora, and non-public fora." Flint v. Dennison, 488 F.3d 816, 830 (9th Cir. 2007). In a traditional public forum, such as a park or sidewalk, restrictions on speech are subject to strict scrutiny and regulations must be "narrowly drawn to achieve a compelling state interest." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992). When a nontraditional forum is intentionally opened for public discourse, it creates a designated public forum, and restrictions are analyzed with the same strict scrutiny as traditional public fora. Hills v. Scottsdale Unified Sch. Dist. No. 48, 329 F.3d 1044, 1049 (9th Cir. 2003) (internal citations omitted). All remaining property is non-public fora. DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 965 (9th Cir. 1999). The government may, however, create a

"limited public forum" by intentionally opening a non-public forum to certain groups or topics. Id.

If the forum is non-public, a more lenient standard applies, and the government may restrict access "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because the public officials oppose the speaker's view." Cornelius, 473 U.S. at 800 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983)). Here, Plaintiffs make a compelling argument that the School District created a limited public forum by opening up school property for certain groups and events, such as the flower sale that took place during the strike, and other school-sponsored and non-school sponsored events that happen there on a regular basis. However, as discussed above, the Court will assume that the School District's property is non-public forum and apply the more lenient standard.[1] Thus, the Picketing Resolution and the Check-Out Notification Letter are constitutional only if the restrictions they place on speech are (1) reasonable in light of the purpose served by the school and (2) are viewpoint neutral.

The "reasonableness" requirement for restrictions on speech in a non-public forum "requires more of a showing than does the traditional rational basis test; i.e., it is not the same as establish[ing] that the regulation is rationally related to a legitimate governmental objective, as might be the case for the typical exercise of the government's police power." Tucker v. State of California Dept. of Educ., 97 F.3d 1204, 1215 (9th Cir.1996) (internal quotation and citation omitted) (alteration in original). There must be evidence in the record to support a determination

---

[1] The School District asserts that school property is not a "non-public forum," but in fact "not a forum at all." The Court finds no support in law for this novel assertion. It is clearly established that if government property is not a traditional public forum, or a designated public forum, it falls into the third category of fora, whatever the label. The cases cited by the defendant include discussions of a scholarship program, library internet access, online fora, and other nontraditional "government property" that is not real property. These cases are not applicable here. See Locke v. Davey, 540 U.S. 712 (2004) (scholarship program) and U.S. v. American Library Ass'n, Inc., 539 U.S. 194 (2003) (internet access).

that the restriction is reasonable. Id. (citing Searcey v. Harris, 888 F.2d 1314, 1322 (11th Cir. 1989)). The government need not choose the least restrictive alternative when regulating speech in a non-public forum. See Swarner v. United States, 937 F.2d 1478, 1482 (9th Cir.1991). "However, its failure to select simple available alternatives suggests that the ban it has enacted is not reasonable." Tucker, 97 F.3d at 1216 (internal quotations and citations omitted).

In this case, the School District enacted a complete and total ban that disallowed any striking teacher's presence on school property. The School District argues that it has a right to enact such a ban due to its educational mission and duty to the students. However, the restrictions in the Picketing Resolution and the Check-Out Notification Letter have nothing to do with education of students. For instance, restrictions are not based on a certain time of day when picketing would disturb classes, or certain areas of school property that would be out of sight for students or otherwise less distracting. Nor did the restrictions allow for possible non-disruptive demonstrations, such as quiet, peaceful picketing. The School District is not required to consider these particular alternatives, which are merely given by way of example, but the lack of any simple, less-extreme alternative indicates that the blanket ban is indeed unreasonable.

Nonetheless, even if the restrictions are reasonable, the School District still violated the First Amendment, because the restrictions are not viewpoint neutral. The Ninth Circuit has recognized that "where the government is plainly motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum, it is regulating a viewpoint rather than a subject matter. Sammartano, 303 F.3d at 971. Even where a proffered justification for regulating a non-public forum is facially reasonable, the justification cannot save a regulation "that is in fact based on the desire to suppress a particular point of view." Cornelius, 473 U.S. at 812.

In this case, the restrictions are facially viewpoint neutral: the Resolution prohibits "picketing," which is to say all picketing, not just picketing by the Association members against the School District's position on the collective bargaining agreement. However, it is undisputed that the Picketing Resolution was passed in direct response to the Association's notice of the strike, and was rescinded immediately after the situation was resolved. As discussed above, the School District has admitted that "the purpose of the resolution – the reason we passed resolutions on these particular dates. . . is that we believed that we were going to have an employee strike." Deposition of Cynda Rickert, 12:15. There is no question that the Resolution targeted the Association and aimed specifically to suppress the members' viewpoint, which was directly opposed to the School District's viewpoint. The government may not place restrictions on speech merely to silence a particular viewpoint, which is clearly what happened in this case. Therefore the Resolution and the Check-Out Notification Letter were unconstitutional restrictions on the First Amendment rights of the striking teachers and Association members.

### V.   The School District violated the Oregon Constitution.

As a preliminary matter, the School District argues that Plaintiffs' remaining state law claims should be dismissed because the Oregon Employment Relations Board ("ERB") has exclusive jurisdiction over all claims arising out of a labor dispute. The Court disagrees. The ERB has exclusive jurisdiction to interpret the Public Employee Collective Bargaining Act ("PECBA"), ORS 243.650 *et seq*, and all claims requiring a determination of whether or not there has been an unfair labor practice committed in violation of PECBA should indeed by decided by the ERB. See Ahern v. Oregon Pub. Employees Union, 329 Or. 428, 988 P.2d 364 (1999). However, in this case, Plaintiffs' claims are brought under the Oregon Constitution, and

do not require any such interpretation or determination under PECBA. Therefore this Court properly has jurisdiction over these claims.

Article I, section 8, of the Oregon Constitution provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

In State v. Robertson, the Oregon Supreme Court established a framework for evaluating whether a law violates Article I, section 8. 293 Or. 402, 649 P.2d 569 (1982). The Court describes the Robertson framework as consisting of three categories. State v. Babson, 355 Or. 383, 390-91, 326 P.3d 559, 566 (2014) (citing State v. Plowman, 314 Or. 157, 164, 838 P.2d 558 (1992), cert. den., 508 U.S. 974 (1993)). Under the first category, a court should begin by determining whether a law is "written in terms directed to the substance of any 'opinion' or any 'subject' of communication." Robertson, 293 Or. at 412, 649 P.2d 569. If it is, then the law is unconstitutional, unless the scope of the restraint is "wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." Id.

If the law survives the first inquiry, a court then determines whether the law focuses on "forbidden effects," and, particularly, whether the proscribed means of causing those effects include speech or writing, or whether the law is directed only against causing the forbidden effects. Id. at 417–18, 649 P.2d 569. If the law focuses on forbidden effects, and the proscribed means of causing those effects include expression, then the law is analyzed under the second Robertson category. Under that category, the court determines whether the law is overbroad, and, if so, whether it is capable of being narrowed. Id. If, on the other hand, the law focuses

only on forbidden effects, then the law is in the third <u>Robertson</u> category, and an individual can challenge the law as applied to that individual's circumstances. <u>Id</u>. at 417, 649 P.2d 569.

In this case, the Picketing Resolution and the Check-Out Notification Letter are restrictions on "picketing activities," "picketers," and "bargaining union members" who are on strike. "Picketing" is "[t]he demonstration by one or more persons outside a business or organization to protest the entity's activities or policies and to pressure the entity to meet the protesters' demands; esp., an employees' demonstration aimed at publicizing a labor dispute and influencing the public to withhold business from the employer." BLACK'S LAW DICTIONARY 1184 (8th ed. 2004). Beyond any legal definition, common sense tells us that, as a demonstration in protest of an action by an entity, picketing is, fundamentally, the expression of an opinion. Therefore, because the Picketing Resolution and the Check-Out Notification letter are aimed at restricting such expression of an opinion, they are content-based and fall into the first <u>Robertson</u> category. Both restrictions are thus unconstitutional unless they fall into a historical exception. "Examples [of historical exceptions] are perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants." <u>Robertson</u>, 293 Or. 412, 649 P.2d 569. Picketing does not fall into one of these exceptions.

Similarly, the Sign Resolution directly restricts any expression that occurs on a sign or on a banner. As discussed in the sections above, this is a policy which subjects all non-school-sponsored communications to pre-distribution review for content censorship. As a restriction on content, it falls into the first <u>Robertson</u> category, and without any indicated historical exception, it is unconstitutional. Even if the Sign Resolution is a restriction on forbidden effects, putting it in the second <u>Robertson</u> category, the language of the resolution is focused on written expression

and is overbroad. It bans all signs and banners, regardless of whether a sign or banner's expression is protected speech; therefore it is unconstitutional under either Robertson category.

The Oregon Supreme Court has recognized, however, that the government may impose reasonable time, place, and manner restrictions that are unrelated to the substance of any particular message. Outdoor Media Dimensions, Inc. v. Dep't of Transp., 340 Or. 275, 289, 132 P.3d 5, 12 (2006) (citing and discussing City of Hillsboro v. Purcell, 306 Or. 547, 761 P.2d 510 (1988), State v. Henry, 302 Or. 510, 525, 732 P.2d 9 (1987), City of Portland v. Tidyman, 306 Or. 174, 182, 759 P.2d 242 (1988)). For instance, in City of Hillsboro v. Purcell, the Court struck down as overbroad a city ordinance that banned door-to-door solicitation. 306 Or. at 554, 761 P.2d 510. The Court pointed out, however, that the city could adopt regulations "that do not foreclose expression entirely but regulate when and how it can occur." Id. The Court emphasized that Article I, section 8, did not prohibit "reasonable limitations on door-to-door solicitations" that "regulate[d], rather than totally proscribe[d]" the practice. Id. at 556, 761 P.2d 510.

In this case, as thoroughly discussed in previous sections above, the School District did not reasonably limit the time, place, and manner of the Association's picketing, but instead it imposed a blanket ban that directly suppressed the viewpoint of the Plaintiffs in this case. Therefore, the Picketing Resolution and the Check-Out Notification and the Sign Resolution are unconstitutional under Article 1, section 8 of the Oregon Constitution and the School District should be enjoined from reinstating them in the future.

## CONCLUSION

As the Ninth Circuit has noted more than once in recent years, "school administrators face the daunting task of evaluating potential threats of violence and keeping students safe

without impinging on their constitutional rights." Diarano v. Morgan Hill Unified School District, 767 F.3d 764 (9th Cir. 2014) (quoting Wynar v. Douglas County School District, 728 F.3d 1062, 1064 (9th Cir. 2013)). This task is made even more difficult when the unified team of teachers and administrators has been fragmented and torn apart by a collective bargaining stalemate. The importance of educating and caring for students in the midst of such a crisis cannot be overstated. However, it is precisely this mission that gives an even higher purpose to the protections and freedoms afforded by the Constitution. In this case, what could have been an incredible opportunity for students to witness the function of the Bill of Rights in their very own lives and learn first-hand that the important principles of our government are not mere platitudes, instead became a situation of reactionary, fear-based policies designed to suppress any opposition or unpopular viewpoint.[2]

Unlike cases heard in other courts, here the school administrators had no indication of potential violence, disruption, or other potential harm to students or teachers or members of the public, which might have justified their actions. Neither did they make any effort to cooperate with the Association to find a solution and enact reasonable time, place, and manner restrictions on striking activities. There is no indication that the Association was unwilling to consider such reasonable restrictions, nor that its members would have been opposed to a dialogue about potential compromises to avoid class disruptions.[3] While the Court does not favor second-

---

[2] As eloquently written by Justice Robert H. Jackson: "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 637 (1943) quoted by Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 507 (1969).

[3] In fact, the [principal] Allen Barber noted in his deposition that the strike captain was very civil in discussing where the picketers were allowed to be. "Anytime there was a question about where those boundaries were, he was

guessing the difficult decisions made by school administrators, the drastic, sweeping policies enacted here cannot be condoned, nor can they be permitted to reoccur in the future.

## RECOMMENDATION

For the reasons stated above, defendants' motion for summary judgment (#56) should be DENIED and Plaintiffs' motion for summary judgment (#63) should be GRANTED. Plaintiffs should be granted declaratory relief and nominal damages for their claims under the First Amendment, and defendants should be enjoined from re-enacting the resolutions and policies at issue.

**This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.** Any notice of appeal pursuant to Federal Rule of Appellate Procedure Rule 4(a)(1) should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. **Objections to this Report and Recommendation, if any, are due no later than fourteen days after the date this recommendation is filed. If objections are filed, any response is due within fourteen days after the date the objections are filed**. See FED. R. CIV. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED this ___6___ day of April, 2015.

MARK D. CLARKE
United States Magistrate Judge

---

a phone call away. He always answered. He was easy to work with." Kaplan Decl. Ex. 14 at 8 (Barber Dep. 10:18-23).